# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LESLIE ZUCK,

       Plaintiff,

    v.

PENNSYLVANIA CERTIFIED
ORGANIC, INC.,

       Defendant.

No. 4:19-CV-01983

(Chief Judge Brann)

## MEMORANDUM OPINION

### NOVEMBER 3, 2021

In their motion for summary judgment, Pennsylvania Certified Organic moves to dismiss Leslie Zuck's complaint alleging that she was terminated from her position as Executive Director of the organization in violation of the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act. That motion is now ripe for disposition.

But before I delve into the merits of Zuck's claims, a summary of the facts and relevant legal standard are required.

## I.  FACTUAL BACKGROUND

Leslie Zuck founded Pennsylvania Certified Organic in 1996.[1] And in the years that followed, the organization established itself as a provider of organic

---

[1]    Doc. 22-1 at ¶ 5.

farming certifications and education services.[2] But after two-plus decades at the helm, Zuck was terminated for repeated violations of the organization's professional conduct clause.[3]

Zuck's termination, however, was preceded by a few key events, which are at the center of this suit.

The story begins in 2015, when a dispute between Zuck and the then-Board nearly boiled over. The parties' accounts differ. In Pennsylvania Certified Organic's telling, by then the parties had a tumultuous relationship that was outright "dysfunctional"—fueled by Zuck's "resistance and non-accommodation to the Board's concerns"—which led the Board to attempt to terminate her.[4] But in Zuck's view, the dispute was a prelude of things to come—amounting to nothing more than another, earlier illegal attempt to oust her (which she says is altogether irrelevant to the current suit).[5] Regardless of fault, neither side came out unscathed: after the failed termination attempt, several Board members resigned; at the same time, however, Zuck's contract was not renewed and she carried on as Executive Director on an at-will basis.[6]

Despite the turnover and newly constituted Board's attempts to make amends, which included the formation of an executive committee to support Zuck in her role

---

[2]    *Id.* at ¶ 2.
[3]    *Id.* at ¶¶ 47 & 51.
[4]    *Id.* at ¶¶ 10–14.
[5]    Doc. 25 at ¶¶ 10–14.
[6]    Doc. 22-1 at ¶¶ 9–14; Doc. 25 at ¶¶ 9–14.

as Executive Director, the Zuck-Board relationship never dipped below a simmer. Problems soon emerged over Zuck's unwillingness to supply the Board with a succession plan and Board members repeated entreaties about her retirement plans.[7] These two fissures often overlapped. With this succession plan hanging in the balance, she was asked by two consecutive Board Presidents (one in 2015, the other in 2017) about her retirements plans, with one dropping that "she was 'probably getting close' . . . ."[8] Zuck eventually submitted a plan that named Diana Underwood and Kyla Smith as standing appointees should she resign or retire—but that was only after months of delay and a 45-minute phone call from a Board member pleading with her to complete it.[9]

Tension between Zuck and the Board during this stretch appears to have been standard, but in Pennsylvania Certified Organic's recounting of the events, it was problems outside the boardroom that had begun to bubble to the surface which ended her tenure. While her 2017 performance review noted that she had met or exceeded all expectations and had done "a very good job considering the circumstances," it also included that "she had a 'dictator style' of leadership, was defensive, not always transparent, and did not foster trust."[10] Nor were observations about Zuck's overbearing style limited to her performance reviews: Pennsylvania Certified

---

[7]  Doc. 22-1 at ¶¶ 17–19, 40–42.

[8]  *Id.* at ¶¶ 40–42.

[9]  *Id.* at ¶¶ 19–20.

[10]  *Id.* at ¶ 16 (noting her deficiencies); Doc. 25 at ¶ 16 (noting her strengths).

Organic also points to complaints from former employees that emerged during this stretch.[11] In one, a former employee complained by letter to the Board that Zuck's meddling preventing her from effectively managing Education and Outreach efforts, leaving the staff confused and stressed.[12] In another, a different former employee— although noting that the problems stemmed from Zuck's passion for the organization and organic farming—called the workplace atmosphere "toxic" because of her "unhealthy and unprofessional behavior."[13]

Pennsylvania Certified Organic claims that these reported performance problems prompted them to act.[14] In early 2018, the Board commissioned a review of Zuck's leadership by an outside consultant, Barbara Chen. The parties disagree about many aspects of this report (dubbed a "360-review"). To name just a few: the 360-review's purpose, whether it was done in accordance with company policy, Zuck's level of involvement, whether it provided an accurate picture of Zuck's leadership or was biased, and the extent to which it portrayed Zuck as an honest and capable leader.[15]

Setting aside the many grounds for disagreement, what's plain is that Chen's report captured feedback from 87 of Pennsylvania Certified Organic employees,

---

[11]   Doc. 22-1 at ¶¶ 19-21.

[12]   *Id.* at ¶ 22.

[13]   *Id.* at ¶ 23.

[14]   *Id.* at ¶ 24.

[15]   *Id.* at ¶¶ 26–35 (recounting Pennsylvania Certified Organic's version of events); Doc. 25 at ¶¶ 26–35, 63–66, 68–79 (describing Zuck's).

Board members, organization members, and community members about Zuck's performance—and much of it was negative.[16] For instance:

- Zuck was alleged to have been "seen by the organic sector as a divisive force, not in harmony with the [Pennsylvania Certified Organic Board]."[17]

- The report also noted that "[s]he appears to serve on boards for personal self-interests," that "[m]ultiple respondents are concerned that outsiders will view [Pennsylvania Certified Organic] critically because of her behavior and attitude," and that there were "allegations of financial mismanagement."[18]

- It was also asserted that Zuck was "known to stop people in [the] midst of conversations, shun them, speak badly of people to others, berates staff in public areas of the office, yells at staff when a task that she was supposed to do was not done."[19]

- The report also included the troubling allegation that "she verbalized a death threat towards a staff person who offered a suggestion. [And n]o action was taken to address this incident."[20]

- And finally, the consultant's report "concluded that '[Pennsylvania Certified Organic] is suffering from a culture of fear, intimidation and poor role

---

[16]   Doc. 22-1 at ¶¶ 30, 33–35.
[17]   *Id.* at ¶ 34.
[18]   *Id.* at ¶¶ 33–34.
[19]   *Id.* at ¶ 34.
[20]   *Id.*

modeling. [Zuck] continually undermines morale, creating a psychologically unsafe, hostile work environment."[21]

But upon receiving this troubling report in the late spring, the Board took no action—bringing us to the next key event.[22]

A few months later, Luke Howard, the President of the Pennsylvania Certified Organic Board, sought out Zuck for a discussion over dinner.[23] And at that summer dinner, Howard asked whether Zuck had considered retiring, and proposed a few different off-ramps.[24] In Howard's telling, the discussion wasn't prompted by her age—which Zuck contests. Instead, he says that it was prompted by the Board's consideration of a potential merger.[25] Setting aside the impetus, the parties agree that Howard said that it might be the right time for Zuck leave the organization altogether—whether through resignation or retirement—or to accept a diminished role and remain involved as a consultant.[26]

Zuck rebuffed Howard's offer and asked whether his inquiry was performance related.[27] Though armed with the 360-review highlighting her "unprofessional conduct, unsatisfactory performance as a leader, and even financial discrepancies,"

---

[21]   *Id.* at ¶ 35.
[22]   *See id.* at ¶ 32 (noting that the Executive Director Support Committee received the report in the spring of 2018).
[23]   *Id.* at ¶ 37; Doc. 25 at ¶¶ 81–82.
[24]   Doc. 25 at ¶ 81.
[25]   Doc. 22-1 at ¶ 39; Doc. 25 at ¶ 39.
[26]   *Id.*; Doc. 22 at ¶ 39.
[27]   Doc. 25 at ¶ 81.

Howard said that it was not.[28] He instead told her that he had inquired because "the board is ready to move on to the next generation of leadership."[29]

Despite Zuck's rejection, Howard broached the subject again by phone a few days later.[30] During that phone call, he said that he'd help Zuck put together "a retirement plan that the Board would accept," offered a "generous retirement/consultant severance," and "encouraged her to talk with one of the Board members that does executive coaching to discuss how she might transition [out] of her current role."[31] Still, she refused to take the exit.

Two months later, the choice would no longer be hers to make: the Board voted unanimously to terminate her at a special meeting where the results of the 360-review were shared.[32] Zuck, then 60, was done; and following the succession plan that she herself drafted, two much younger employees, Diana Underwood, age 36, and Kyla Smith, age 39, took over as interim co-Executive Directors.[33]

## II. LEGAL STANDARD

Before I proceed to the merits of Zuck's claim that her firing was unlawful age discrimination, a review of the appropriate legal standard is in order.

---

[28] Doc. 25 at ¶ 66; Doc. 22-1 at ¶ 47.
[29] Doc. 22-1 at ¶ 38.
[30] Doc. 25 at ¶ 82.
[31] *Id.* at ¶ 82–84.
[32] *Id.* at ¶ 52.
[33] *Id.* at ¶ 54; Doc. 25 at ¶ 52 (noting the ages).

Federal Rule of Civil Procedure 56 prescribes the procedures for granting summary judgment. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[34] Therefore, to rule on a motion for summary judgment, a court must determine whether the parties have raised a *factual* dispute, whether that dispute is *material* to the conclusion of the case, and whether the dispute is *genuine*.[35] If the court finds no factual dispute, or concludes that it is immaterial or not genuine, it will then evaluate whether the moving party is entitled to judgment as a matter of law.[36]

Facts are material where they could alter the outcome of the case, and disputes are genuine if evidence exists from which a rational person could conclude that the party bearing the burden of proving this fact is correct.[37] For movants and non-movants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (1) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (2) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (3) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[38]

---

[34]   Fed. R. Civ. P. 56(a).

[35]   *See id.*

[36]   *Id.*

[37]   *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (first citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); and then citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[38]   Fed. R. Civ. P. 56(c)(1).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[39] "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[40]

If the movant does not bear the burden of proof at trial, they may succeed if they can point out "an absence of evidence that rationally supports the plaintiff's case."[41] In such cases, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[42] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[43]

---

[39]  *Celotex*, 477 U.S. at 323 (internal quotations omitted).
[40]  *Id.*
[41]  *Clark*, 9 F.3d at 326.
[42]  *Liberty Lobby*, 477 U.S. at 252.
[43]  *Id.*; *see also Celotex*, 477 U.S. at 323-24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.").

Once the movant has sufficiently stated grounds for summary judgment, the burden then shifts to the nonmovant to set forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[44] "When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[45] "[I]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[46] On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[47]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[48] "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[49] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[50]

---

[44] *Liberty Lobby*, 477 U.S. at 250.

[45] *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[46] Fed. R. Civ. P. 56(e)(2).

[47] Fed. R. Civ. P. 56(c)(3).

[48] *Liberty Lobby*, 477 U.S. at 249.

[49] *Id*.

[50] *Id*. at 249–50 (internal citations omitted).

### III.   ANALYSIS

With the factual background and legal standard now in order, we can advance to the merits: can Zuck's age discrimination claims under the Age Discrimination in Employment Act (ADEA) and the Pennsylvania Human Relations Act (PHRA) advance past summary judgment?[51]

To begin with, "the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."[52] The parties here make no mention of a pertinent distinction, so I'll proceed under the ADEA framework.

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."[53] Employees that believe they have been discriminated against can make their case through direct or indirect evidence. And when, as is the case here, the plaintiff intends to show age discrimination through indirect evidence, courts review the ADEA claim using the three-step *McDonnell Douglas* burden-shifting framework.[54]

---

[51]   Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634; Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq*.

[52]   *Slagle v. Cnty. of Clarion,* 435 F.3d 262, 265 n.5 (3d Cir. 2006) (quoting *Fasold v. Justice,* 409 F.3d 178, 184 n.8 (3d Cir. 2005)).

[53]   29 U.S.C. § 623(a)(1).

[54]   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (holding that the *McDonnell Douglas* burden-shifting framework, which was developed to assess Title VII claims, also applies to indirect claims under the ADEA); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

At bottom, "the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination."[55] In route to this destination, the plaintiff bears the initial burden. To make out her prima facie case, Zuck must show that "(1) she belongs to a protected class, *i.e.*, was over forty; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the presence of circumstances supporting an inference of discrimination."[56] By satisfying these elements—which is a "minimal burden"—Zuck can establish a presumption that Pennsylvania Certified Organic's discharge constituted unlawful discrimination.[57]

But Pennsylvania Certified Organic can then defeat this presumption by producing evidence that shows a "legitimate nondiscriminatory reason" for firing Zuck.[58] And the operative word here is "producing": "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"[59]

So if Pennsylvania Certified Organic produces some evidence showing a nondiscriminatory reason, the burden will shift back to Zuck, who must then show

---

[55]   Texas Dept. of Cmty. Affs. v. Burdine, 450 U.S. 248, 255 n.8 (1981).

[56]   *Klimczak v. Shoe Show Cos.*, 420 F. Supp. 2d 376, 386 (M.D. Pa. 2005) (Caputo, J.).

[57]   *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

[58]   *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 254).

[59]   *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

"that the legitimate reasons offered by [Pennsylvania Certified Organic] were not its true reasons, but were a pretext for discrimination."[60]

### A. Pennsylvania Certified Organic's Challenge to Zuck's Prima Facie Case

Pennsylvania Certified Organic first challenges whether Zuck met her "minimal burden" to make out a prima facie case.[61] They do not challenge the first three prongs; they concede that she is over 40, that her termination was an adverse employment action, and that she was objectively qualified for the job.[62] Their claim instead rests on the fourth prong: "the presence of circumstances supporting an inference of discrimination."[63]

In Pennsylvania Certified Organic's view, this prong's "ultimate focus" is "whether the plaintiff can establish that her age 'played a role in the employer's decision-making process and had a determinative influence on the outcome of that process.'"[64] And they argue that the evidence that Zuck has put forward—previous Board members' questions about her retirement plans, Howard's comment that the Board wanted to move on to the "next generation of leadership," and her temporary

---

60    *Id.* at 143.
61    *See Woodman*, 411 F.3d at 76.
62    Doc. 23 at 5–6.
63    *Kimczak*, 420 F. Supp. 2d at 386; *see* Doc. 23 at 6.
64    Doc. 23 at 6 (quoting *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300 (3d Cir. 2004)).

replacement by younger interim staff members—do not suffice.[65] As I'll explain, they miss the mark on both counts.

To start, whether age "played a role in the employer's decisionmaking process and had a determinative influence on the outcome of that process" is not—as Pennsylvania Certified Organic claims—the "ultimate focus" of the fourth element of Zuck's prima facie case.[66] Age's influence is the focus of the broader case; and Zuck bears the ultimate burden on this front.[67] But a lesser showing is required to move past the fourth element of the prima facie case: Zuck only needs to offer evidence that, absent any legitimate reason, the circumstances would permit an inference that she was fired because of her age.[68] And in demotion or discharge ADEA cases, this inference is *ordinarily* established if the employee's "replacement is substantially younger . . . ."[69] On this standard, Zuck clears the bar comfortably: she, a then-60-year-old was replaced by a 36- and 39-year-old.

If the inquiry centers on an inference, rather than establishing that age "had a determinative influence on the outcome of that process" as they first suggested (unsuccessfully), Pennsylvania Certified Organic's next argues that this case is out

---

[65]   *Id.* at 6–12.
[66]   *See id.* at 6; *Monaco*, 359 F.3d at 300.
[67]   *See Reeves*, 530 U.S. at 141–43.
[68]   *Hicks*, 509 U.S. at 506–07.
[69]   *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996); *Klimczak*, 420 F. Supp. 2d at 386. Replacement by a younger employee is so typical that the fourth element, "the presence of circumstances supporting an inference of discrimination," is often just replaced with language to that effect. *See e.g., Monaco*, 359 F.3d at 300; *Duffy v. Paper Magic Grp, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001).

of the ordinary.[70] Their claim that this age disparity shouldn't shift the burden hinges on the fact that by drafting a succession plan that the Board followed, Zuck named her own replacements.[71] In Pennsylvania Certified Organic's view, this won't do. And without the presumption that this age gap creates, they further argue that the rest of her evidence—the questions from previous Board members about her retirement plans and Howard's "next generation" comment—doesn't create an inference.[72]

To support this theory, Pennsylvania Certified Organic points to *Woodman v. WWOR-TV*, an age discrimination case decided by the United States Court of Appeals for the Second Circuit.[73] They argue that a no-inference-from-a-named-replacement rule "follows logically" from the holding in *Woodman*—that no inference arose from a significant age gap when the defendant did not know of that age gap.[74] In their view, this case means that "in certain cases presenting unique fact patterns, discriminatory intent may not be inferred merely from the age discrepancy between a terminate employee and her replacement at the prima facie stage, but demands something more."[75]

---

[70]   Doc. 23 at 6.
[71]   *Id.* at 10–12.
[72]   *Id.* at 6–10.
[73]   *See* Doc. 23 at 10–12; Doc. 26 at 11–12.
[74]   *See Woodman*, 411 F.3d at 82–83.
[75]   Doc. 26 at 12.

I think that's quite the stretch. And a thorough reading of *Woodman* shows why.

In *Woodman*, the Second Circuit considered an age discrimination claim by a 61-year-old who was fired during a merger.[76] The fired employee's company was being bought and the combined company needed just one person to manage its sales staff, so buyer elected to keep on its own 43-year-old manager, herself a 12-year veteran of the company.[77] Importantly though, the buyer reached this decision without the 61-year-old's personnel file.[78] So the information provided by the seller included her title, how many years she worked at the company (16), and her salary—but not her age.[79]

In the District Court's mind, that the buyer didn't know how old she was decided the matter: the fired employee's "failure to adduce evidence indicating [the buyer's] knowledge that she was significantly older than the person to whom her duties were transferred precluded her establishment of a prima facie case of age discrimination."[80] The Second Circuit affirmed. And in doing so, they explained why this particular set of facts—an employee fired by an employer that was unaware of

---

[76]   *Woodman*, 411 F.3d at 72.
[77]   *Id.* at 73
[78]   *Id.* at 72–73.
[79]   *Id.*
[80]   *Id.* at 75.

- 16 -

her age—warranted a heightened burden at the prima facie stage which they "otherwise characterized . . . as 'minimal' and 'de minimis.'"[81]

For one, the Second Circuit explained, the prima facie case requires "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion . . . ."[82] And "[a] replacement decision cannot be 'based on' the discriminatory criterion of age unless an employer knows that it has replaced an older employee with a significantly younger worker."[83] Likewise, the court emphasized a no-knowledge-required rule's incongruence with a presumption's legal effect: "to establish a 'presumption' is to say that a finding of the predicate fact (here, the prima facie case) produces 'a required conclusion in the absence of an explanation' (here, the finding of unlawful discrimination).'"[84] Thus, "[w]ithout some evidence than an employer knew that it was replacing an older worker with a younger one, intentional discrimination cannot be a 'required conclusion.'"[85] In short, knowledge is a prerequisite to an inference: it's illogical to infer that an employer discriminated on the basis of trait that they were unaware of, but the *McDonnell Douglas* framework would otherwise require that presumption if the employer could provide no other explanation.[86]

---

[81]   *Id.* at 76 (quoting *Zimmerman v. Assocs. First Cap. Corp.*, 25 F.3d 376, 381 (2d Cir. 2001)).
[82]   *Id.* at 80 (quoting *O'Connor*, 517 U.S. at 312) (alterations omitted).
[83]   *Id.*
[84]   *Id.* at 81 (quoting *Hicks*, 509 U.S. at 506) (alterations omitted).
[85]   *Id.*
[86]   *Id.* at 81–82.

The Second Circuit further buttressed this point by highlighting instances when the Supreme Court and its fellow circuit courts had required knowledge of the pertinent trait in other types of discrimination cases—which also employ the *McDonnell Douglas* framework. Indeed, they noted that the Supreme Court had required knowledge of a disability in an Americans with Disability Act case, in line with prior decisions by the Sixth and Eleventh Circuits on the same subject.[87] They likewise highlighted that our own Third Circuit had required knowledge of a fired employee's pregnancy in the context of a Title VII Employment Discrimination claim, with the Sixth and Seventh Circuits following suit.[88] They also emphasized that the Eleventh Circuit had taken a similar approach when faced with a Title VII Employment Discrimination claim involving religion, finding that the plaintiff's prima facie case failed because there was no evidence that the employer knew about his religion.[89] And, finally, they included that the Ninth Circuit too had dismissed a Title VII Employment Discrimination claim based on an applicant's race because he was rejected without an interview and could provide no proof that the prospective employer knew that he was a member of a protected class.[90]

---

[87]   *Id.*; *see Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173 (6th Cir. 1996); *Morisky v. Broward Cnty.*, 80 F.3d 445 (11th Cir. 1996).

[88]   *Woodman*, 411 F.3d at 82; *see Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578 (3d Cir. 1996); *Prelilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438 (6th Cir. 2002); *Clay v. Holy Cross Hosp.*, 253 F.3d 1000 (7th Cir. 2001).

[89]   *Woodman*, 411 F.3d at 82; *see Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301 (11th Cir. 2002).

[90]   *Woodman*, 411 F.3d at 82; *see Robinson v. Adams*, 847 F.2d 1315 (9th Cir. 1987).

This is all to say that *Woodman* is not a case to blindly riff on. It does not mean that a plaintiff's burden at the prima facie stage can be heightened whenever something "unique" or "atypical" is identified.[91] It's about knowledge, not typicality. So its reach is accordingly circumscribed: plaintiffs do not get an automatic inference based on an age disparity if they fail to show that the employer knew how old they were—and that's because any other result would lead to a breakdown in the *McDonnell Douglas* framework.[92]

That isn't the case with the "unique fact pattern" that Pennsylvania Certified Organic puts forward here. The Board knew that the would-be interim directors were substantially younger than Zuck (and it's not as though they were beholden to Zuck's succession plan.)[93]

Put simply, Pennsylvania Certified Organic is far from the victim of a mislaid hand that set off a Rube Goldberg Machine. By firing Zuck, they tipped the first domino. They cannot now pretend to be the dumbfounded recipient of the result.

Knowledge of the age discrepancy satisfies the fourth element. Therefore, it may be presumed that Pennsylvania Certified Organic's "acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."[94] Though I'll return to them, I need not delve into whether the previous

---

[91]   *See* Doc. 23 at 11; Doc. 26 at 12.
[92]   *Woodman*, 411 F.3d at 80–83.
[93]   Doc. 26 at 12.
[94]   *Woodman*, 411 F.3d at 81 (quoting *Burdine*, 450 U.S. at 254).

Board member's inquiries into her retirement plans or Howard's comment that organization was ready to move on to "the next generation of leadership" would otherwise permit an inference. Zuck has met her prima facie burden.

### B.   Pennsylvania Certified Organic's Legitimate, Non-Discriminatory Reason for Terminating Zuck

Given that Zuck has made out a prima facie case, the burden then shifts to Pennsylvania Certified Organic to provide a legitimate, nondiscriminatory reason for terminating Zuck.[95] To meet this burden, Pennsylvania Certified Organic has offered evidence, which is not assessed for its credibility at this stage, that includes the following:

- A 2015 letter from the Board Executive Committee to Zuck "describing a 'culture of resistance and non-accommodation to board concerns that are counter to the stated desire to encourage an atmosphere of cooperation and mutual collaboration' and concluding that its decision not to renew [Zuck's] contract was to 'make its current level of frustration and dissatisfaction clear.'"[96]

- Zuck's 2017 Performance Review, which "indicated that she needed to improve her 'dictator style,' she was 'defensive' . . . 'not always

---

[95]   *See e.g.*, *Reeves*, 530 U.S. at 142.
[96]   Doc. 23 at 13.

transparent' . . . and did 'not foster trust.'"[97] This review also noted that she had failed to provide a succession plan.[98]

- And Zuck's 2018 360-review, which detailed responses from an anonymous survey accusing her of failing to "promote a culture of appreciation, positive leadership or being strategic in planning"; poor financial planning and "'abusive behavior' when questioned about non-budgeted expenses"; "consistently ignoring policy to refrain from soliciting clients"; showing "unprofessional behavior at times in public: demeaning staff . . . displaying emotional outbursts when she is upset"; creating an "culture of fear, intimidation and poor role modeling"; and "verbaliz[ing] a death threat toward a staff person after that person offered a suggestion . . . ."[99]

Given that they have introduced evidence documenting performance concerns, which date back to 2015, Pennsylvania Certified Organic has met its burden production.

### C.  Zuck's Evidence that Pennsylvania Certified Organic's Decision Was Pretext for Discrimination

Now, having established that Zuck has stated a prima facie case and Pennsylvania Certified Organic has met its burden to provide a legitimate nondiscriminatory reason for her firing, "the *McDonnell Douglas* framework—with

---

[97]  *Id.* at 14.
[98]  *Id.*
[99]  *Id.* at 15–16.

its presumptions and burdens—is no longer relevant."[100] Instead, the question is whether the Zuck has can "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."[101] Proof of pretext takes two forms: it can be evidence showing that the employer's supposed reasons are a farce; and it can also be evidence bolstering the fired employee's case that discrimination was at play.[102]

At this final stage, whether Pennsylvania Certified Organic is entitled to summary judgment will depend on "the strength of [Zuck's] prima facie case, the probative value of the proof that [Pennsylvania Certified Organic's] explanation is false, and any other evidence that supports [Pennsylvania Certified Organic's] case and that may be considered on a motion for [summary judgment]."[103] But in making this determination, I cannot invade the prerogative of the jury: I "must draw all reasonable inferences" in Zuck's favor and "may not make creditability determinations or weigh the evidence."[104]

---

[100]   *Hicks*, 509 U.S. at 510.

[101]   *Burdine*, 450 U.S. at 253.

[102]   *Fuentes*, 32 F.3d at 764 ("[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial from which a factfinder could reasonably either (1) disbelieve the employer's articulate legitimate reasons; or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.").

[103]   *Reeves*, 530 U.S. at 148–49. In *Reeves*, the Supreme Court considered an appeal of a motion for judgment as a matter of law under Rule 50. But as the court notes, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Id.* at 150 (quoting *Liberty Lobby*, 477 U.S. at 250–51).

[104]   *Id.* at 250.

Zuck's theory of the case goes like this: after several entreaties from past Board members about her plans to retire, the Board commissioned a special evaluation as a pretext to force her out.[105] In support of this conclusion, she points to the fact that the 360-review was not a typical review—nor was it even the sort of review authorized by the employee handbook.[106] She also emphasizes that she was kept in the dark about the process as it unfolded and was never informed of the results.[107] And, finally, she notes that after she was terminated, Pennsylvania Certified Organic returned to the previously employed review process to evaluate its Executive Directors.[108]

Setting aside the atypicality of the process, Zuck further highlights that, regardless of what the review said, the Board was not concerned with her performance. Indeed, when she met with Howard that summer over dinner, he stated—in response to her question about why the Board was interested in transitioning out of her director role—that her performance was not an issue. And, as she notes, Howard said this even though he had the results of the 360-review, which the Board later used to fire her at the September special meeting.[109]

In Zuck's telling, the evidence for pretext generated by her dinner with Howard doesn't stop there. Beyond showing that the report was a farce, she argues

---

[105] Doc. 24 at 10–11.
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*

that what came next bolsters her claim that age discrimination was the likely reason for her firing.[110] After responding that her performance was not the issue, Howard said that the reason he was asking about her willingness to move on was because "the board is just ready to move on to the next generation of leadership."[111] And, as Zuck explains, that's exactly what the Board did, replacing her—a baby boomer—with two millennials.[112]

Though the ultimate outcome is far from a forgone conclusion, at first blush, this sequence of events—with all reasonable inferences drawn in her favor—would permit a fact finder to conclude that Pennsylvania Certified Organic terminated Zuck because of her age. Pennsylvania Certified Organic, however, has raised several challenges to the legal weight of the evidence that Zuck has raised.

I'll turn first to the arguments that Pennsylvania Certified Organic raised at the prima facie stage: that the inquiries from former Board members about her retirement plans and Howard's "next generation" comment "are not probative of discrimination."[113]

Because Zuck herself does not rely on the remarks by previous Board members in her brief, I won't linger on this matter for long. To begin with,

---

[110]   *Id.* at 9; *see Fuentes*, 32 F.3d at 764 (noting that at the third stage of the *McDonnell Douglas* framework a plaintiff can proceed by providing additional evidence of the employer's discriminatory motive).

[111]   Doc. 24 at 9; Doc. 25 ¶ 81.

[112]   Doc. 24 at 2.

[113]   Doc. 23 at 6–10; Doc. 26 at 2–8.

Pennsylvania Certified Organic correctly points out that these inquiries were both distant in time and came from Board members that were no longer involved when she was fired—traits that mute their probative value under Third Circuit precedent.[114] And, in any event, mere inquiries into an employee's retirement plans aren't an issue: "it is common business practice, and not impermissible discrimination, for an employer to inquire about retirement plans in anticipation of staffing needs."[115] While the previous inquiries aren't probative of discrimination, the same cannot be said of Howard's conversation with Zuck over dinner.

Howard's comment to Zuck that the Board was looking to push her out—not because of her poor performance—but because the Board was "just ready to move on to the next generation of leadership" is not so easily evaded.[116] Pennsylvania Certified Organic's argument that this comment ought to be ignored takes multiple forms. For one, they argue that this exchange too is merely a permissible inquiry into her retirement plans.[117]

But the meat of their argument rests on their second contention: that "next generation" in no way implicates age.[118] Without citation, Pennsylvania Certified Organic asserts that "'generation' is commonly defined as a group of individuals

---

[114] *Id.* at 6–7 (citing *Carilli v. Mut. of Omaha Ins. Co.*, 67 F. App'x 133 (3d Cir. 2003) and *Fuentes*, 32 F.3d at 767).

[115] *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 649 (3d Cir. 2015).

[116] Doc. 24 at 6; Doc. 25 at ¶¶ 39, 81–85.

[117] Doc. 23 at 7–8.

[118] *Id.* at 8–10; Doc. 25 at 2–6.

holding a particular status contemporaneously at the same stage of develop."[119] From there, they reason that "'next generation' in this context is not tantamount to 'younger' leadership"—which they then take to mean that "[a]t best . . . 'next generation of leadership' is ambiguous."[120] And, whereas it's only Zuck's "subjective inference" that ties this at-best-ambiguous statement to age, when you consider this ambiguous statement alongside "the undisputed fact that, at that time, [Zuck] had been the only person to serve as Executive Director" the result becomes quite plain: Howard wasn't referencing age.[121] In their view, this combination of facts "compels" this Court to find that Zuck's argument that "next generation" implicates age "would require an 'inferential leap' so great as to become impermissible speculation with no basis in the record, which has been soundly rejected by the Third Circuit."[122]

It's certainly true that a jury could see it that way. And it may be even more likely that a jury would find that Howard's "next generation" comment really just meant that Pennsylvania Certified Organic was ready to start fresh with new leadership and begin the organization's second generation—a sort-of euphemistic, non-responsive response to Zuck's initial query. But these arguments essentially ask

---

[119] Doc. 23 at 9.
[120] *Id.*
[121] Doc. 25 at 8.
[122] *Id.*

that I view the evidence and draw all reasonable inferences in favor of Pennsylvania Certified Organic.

Howard's ersatz explanation may have temporarily shielded Zuck's feelings and allowed the Board to continue to try slow-walk her towards the exit. But by uttering "generation," Howard wandered into trouble. The problem for Pennsylvania Certified Organic is that dictionaries also define "generation" as "the entire body of individuals born and living at about the same time,"[123] "a group of individuals, most of whom are the same approximate age, having similar ideas, problems, attitudes, etc.,"[124] "all the people born at about the same time,"[125] "a group of similar age involved in a particular activity,"[126] and "a group of individuals born and living contemporaneously."[127] The commonality? Age. At the summary judgment stage, I'd be hard pressed to dismiss a case on the grounds that a reasonable jury couldn't find that here "next generation" literally meant someone from the next generation— i.e. "younger leadership"—when so many definitions of the word implicate age.

This finding dictates the result of their initial argument—that the conversation was a permissible inquiry into Zuck's retirement plans. While it wouldn't have been impermissible for Howard to inquire about or, as the United States Court of Appeals

---

[123] "Generation" https://www.dictionary.com/browse/generation.

[124] *Id.*

[125] "Generation" https://www.oxfordlearnersdictionaries.com/us/definition/american_english/generation.

[126] *Id.*

[127] "Generation" https://www.merriam-webster.com/dictionary/generation.

for the First Circuit has held, to have even tendered a retirement offer, his discussion with Zuck exceeded these bounds when he delved into the Board's reason for wanting to move on.[128] And their rationale goes to the heart of whether they had discriminatory intent in firing Zuck. Accordingly, their conversation cannot be sidelined as a mere inquiry.

Besides attacking the weight of this conversation, Pennsylvania Certified Organic also argues that Zuck's evidence suggesting that the 360-review was pretextual is insufficient. In their view, Zuck's challenges to the report improperly ask this Court to sit in as a "super-personnel department" and second-guess the Board's business decisions.[129] To an extent, they are correct: an age discrimination case is no place to relitigate the wisdom or harshness of a personnel decision.[130] Courts are ill-suited to that task. As a result, my inquiry is narrower, and instead focusses on whether the decision was "motivated by an illegal consideration"—not on whether the personnel decision was the right one for the business.[131] And here, Zuck has provided evidence that would allow a reasonable fact finder to determine that the negative comments in the 360-review were not the real reason for her firing.

---

[128]   *See Baralt v. Nationwide Mut. Ins. Co.*, 251 F.3d 10 (1st Cir. 2001).

[129]   Doc. 23 at 20 (quoting *Ashley v. Bayhealth Med. Ctr., Inc.*, 869 F. Supp. 2d 544, 555 (D. Del. 2012).

[130]   *See Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 372 (7th Cir. 1992)).

[131]   *Dodge v. Susquehanna Univ.*, 796 F. Supp. 829, 836 (M.D. Pa. 1992).

For one, a jury could find the circumstances suspicious: Pennsylvania Certified Organic deviated from the script in ordering the 360-review—only to return to the typical review process once Zuck was ousted.[132] And, as Zuck notes, she was kept in the dark throughout.[133] That was also atypical; and it raises a question about whether the 360-review's goal was to create the case to move on from an elderly employee, rather than to identify areas that she could work through to improve her performance and relationship with the Board moving forward.[134] This theory of the case would be further supported, as Zuck argues in her brief, by the fact that the 360-review "stick" only came out after she refused the carrot—Howard's initial inquiry into her interest in stepping down.[135]

At the same time, a jury could find that, even if you believe everything in it, her bad review wasn't the real reason she was dismissed. In this sense, Zuck's alternative case is not that she didn't struggle with some managerial tasks, it's that the Board had long taken the bitter with the sweet: for whatever she lacked in one area, she was making up for elsewhere. This conclusion could be reached by considering the fact that similar issues had been identified in reviews and complaints to the Board in years past. Indeed, one only needs to look at her 2017 performance review, which highlighted that she'd met or exceeded all expectations despite its

---

[132]   Doc. 24 at 10; Doc. 26 at ¶¶ 33, 63–65, 68–69, 72, 76 & 90.
[133]   Doc. 26 at ¶¶ 63–64 & 68.
[134]   *Id.*
[135]   Doc. 24 at 10–11.

mentions of her "'dictator style' of leading," her "defensive" mindset, and her failure to be "transparent" or "foster trust."[136] And this result would only be bolstered by the fact that Howard specifically told her that her performance wasn't the issue when she asked him why the Board was looking to move on, had proposed keeping her on as a consultant, and lauded her on her way out the door.[137]

Plenty of organizations are run by flawed visionaries who push both the limits of what the firm can achieve and the limits of acceptable workplace conduct. And it may well be charitable to suggest that Zuck was a flawed visionary. Indeed, from this same evidence a jury could find that the Board instituted this special review in hopes of steadying the ship after a few tumultuous years—only to find that continuing on with Zuck at the head was untenable given the responses showing that she was running the organization aground and driving employees to a near-mutiny.[138]

But as I've belabored throughout, that's not the correct frame when Pennsylvania Certified Organic has moved for summary judgment. A reasonable jury could infer that their supposed reliance on deficiencies identified in the review were pretextual.

---

[136]   Doc. 22-1 at ¶ 16.

[137]   *Id.* at ¶¶ 81, 84 & 91.

[138]   Doc. 22-1 at ¶ 26 (highlighting Tina Ellor statement that the 360-review spawned from that fact "[The Board] had known . . . the previous board tried to fire Leslie and we thought with a really thorough review would figure out where the problems were . . . .").

## IV.   CONCLUSION

Taken together, the evidence that Zuck has added to her prima facie case allows her to survive summary judgment. Though far from "quintessential example of age discrimination" that she makes it out be, Howard's age-implicating comment about moving on to the "next generation of leadership" bolsters her prima facie case. While, at the same time, the evidence that she has adduced showing the peculiarities of the 360-review would allow a reasonable jury member to disbelieve Pennsylvania Certified Organic's stated reason.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge